*22 FOURNET, Chief Justice
(dissenting from the refusal to grant a rehearing).
While I signed the opinion and judgment of this court on original hearing, after reading the application for rehearing and making a thorough study of the case when it fell to me on such application, I am convinced the trial judge, in a most exhaustive, completely documented, and well-considered opinion — wherein the issues are clearly defined and the applicable law correctly applied — is unquestionably correct in his conclusion that a right of servitude of drainage in favor of plaintiff’s estate over that of the defendant did and does not exist. This study of the record, including all exhibits, further convinced me this court’s decision on original hearing will not only result in irreparable injury to the defendant in this case, but also in irreparable injury to all of the property owners in the section similarly situated, although it will result in little, if any, benefit whatever to plaintiff, who has refused to accept the benefits offered by the police jury program, as has defendant and others similarly situated.
The record unquestionably reflects that in all of the area falling between Maringouin Bayou and the Morganza Spillway levee, without the benefit of the comprehensive parish-wide land drainage program, little, if any, of the land involved would be of practical value: certainly it would be valueless for agricultural purposes. This is unmistakably demonstrated in the able trial judge’s opinion, the pertinent portion of which I hereby make a part of my dissent from the refusal to grant a rehearing in the case:
The plaintiff further prays that the court require the defendant to open and clear these old crevasse channels to their natural and original width and depth. The substance of the plaintiff’s demands are set forth in the prayer of his second supplemental petition which is herein shown above in full.
The plaintiff relies on Article 660 of our Civil Code relating to natural drainage servitudes and which reads as follows:
“It is a servitude due by the estate situated below to receive the waters which run naturally from the estate situated above, provided the industry of man has not been used to create that servitude.
The proprietor below is not at liberty to, raise any dam, or to make any other work, to prevent this running of the water.
The proprietor above can do nothing whereby the natural servitude due by the estate below may be rendered more burdensome.”
This case was partially tried on rule for preliminary injunction on June 14, 1964. The parties then entered a stipulation which' is found in the record of this case “Holloway 8”. Under this stipulation the defendant, without prejudice, agreed to. *24 remove from several old crevasse channels on defendant’s property certain old dikes which were constructed hy parties unknown and had been in place for more than sixty years, long prior to defendant’s acquisition. The plaintiff, without prejudice, agreed not to deepen or widen or remove any dirt from any ditch leading into these old channels and that no new ditches would be dug on his property except such as would empty into Bayou Maringouin or Dixie Bayou. The court granted a preliminary injunction as to both parties, which in effect confirmed the stipulation. The judgment is filed in evidence as “Holloway 9.”
The defendant has at all times denied plaintiff’s demands and contentions. It denies that any servitude of drainage exists and particularly says that:
1. The record shows that Kenmore and Eldorado Plantations are of substantially the same elevation, with low and high areas on each,' and therefore Kenmore is not situated below Eldorado or Eldorado above Kenmore within the purview of Article 660 of the Civil Code.
2. The channels through which plaintiff seeks to obtain a servitude or servitudes of drainage are admittedly crevasse channels and as such, because of their natural high banks and low intervening basins cannot naturally drain Eldorado Plantation; and Article 660 of the Civil Code, as interpreted by the Supreme Court, does not permit the plaintiff to cut artificial ditchs or do other drainage work by which waters from Eldorado Plantation may be artificially made to drain through the old crevasse channels.
3. In the alternative, if the court should find that plaintiff’s property or any part thereof ever enjoyed a natural servitude of drainage across defendant’s property through any of these old crevasse channels, which defendant denies, such alleged natural drainage has been abandoned .and converted into artificial drainage as a result of the cutting of numerous artificial ditches and channels through the high banks and into the crevasse channels.
4. Assuming arguendo, but denying, that surface waters can “naturally” flow from the Eldorado Plantation to and across Kenmore Plantation as a result of a difference in elevations, a “Functional” or “Objective” interpretation of Article 660 of the Civil Code does not permit recognition of a drainage servitude; and plaintiff’s drainage needs are otherwise adequately provided for through the drainage program of the police jury of Pointe Coupee Parish.
5. Again, assuming a servitude of drainage is decreed to exist, which is denied, the plaintiff must be required through injunction issued herein to close all existing artificial openings leading into the crevasse channels and must also be enjoined from the cutting of additional artificial ditches *26 and openings or performing other work which would make the servitude more burdensome in violation of Article 660 of the Civil Code.
6. Further, again assuming a servitude of drainage exists, which is denied, in order to avoid irreparable damage and injustice to the defendant, and to afford adequate drainage to the plaintiff, the entire matter should be referred to the Police Jury of Pointee Coupee Parish which has the legal authority, the willingness and the ability to solve the problem. (Defendants’ brief pages 3 & 3A)
The plaintiff is the owner of the Eldorado Plantation and defendant is the owner of the Kenmore Plantation. Both places front on the west side of Bayou Maringouin in the southerly part of Pointe Coupee Parish and extend back in a western direction into the Atchafalaya River swamps. The Eldorado Plantation of the plaintiff is situated to the north of the Kenmore Plantation of the defendant. The relative locations of the properties and of the surrounding area are clearly shown on Exhibit “Holloway 16” found in the record which consists of a composite map made up of the Fordoche quadrangle and the northerly portion of the Maringouin quadrangle. The boundaries of each place have been outlined on this exhibit. Kenmore contains approximately twenty-four hundred acres and Eldorado appears to be about the same size. The main line of the Texas and Pacific Railroad crosses these properties near the front and -runs - generally parallel with Bayou Maringouin in a northerly and southerly direction.
The east protection levee of the Atchafalaya Basin Floodway, constructed in comparatively recent years, crosses the rear portion of both places.
It appears from the record that approximately fifteen hundred acres of the Kenmore Plantation lie outside or to the east of the Atchafalaya Spillway and all of these fifteen hundred acres are now open land. Of these fifteen hundred acres approximately thirteen hundred and fifty (1350) acres lie between the Spillway Canal and the Texas and Pacific Railroad. Approximately nine - hundred of these acres lie between the Spillway Canal on the west and what is known as Little Bayou on the east (TR 550).
Just to the east or land side of this protection levee is what was originally the borrow pit that was formed in the construction of the levee. Following the flood of 1953, at the instigation of citizens of the area, led by Mr. C. O. Watts, the United States Engineers were prevailed upon to dredge out the borrow pit so that it would serve as an adequate drainage canal and outlet for properties located to thf east of and in the vicinity of the protec« tion levee and canal (TR 458). This canal is generally referred to as the “Spillway Canal.”
*28 This area, typical of the alluvial lands of the Lower Mississippi Delta, is overall generally flat, but more particularly undulates or has its intervening ups and downs. The front or east part of each of the plantations, along Bayou Maringouin, is high and the back or west part of each place is low. The overall drop in elevation from the Texas and Pacific Railroad on the east to the Spillway Canal on the west is approximately five feet or more (See Fordoche Quadrangle, Exhibit “Holloway 16”; profile along south boundary of Eldorado on Exhibit “Holloway 12”; Testimony of Svoboda, TR 251; Testimony of Dupree, TR 680).
Over a long distance, it appears there is probably a slight drop in elevation .from a northerly to a southerly direction. However, as between adjoining areas, say as between Eldorado and Kenmore Plantations, as the Soil Conservation Agricultural Engineer Martin testified the fall may be in any direction, north, south, east and west (TR 365). However, as above stated, there is a definite drop in elevation from east to west.
Running across Eldorado and Kenmore Plantations, are the remnants of a number of old channels, which all of the expert witnesses, both defendant’s and plaintiff’s, testified were crevasse channels. (See testimony of plaintiff’s witnesses Svoboda and Coleman and defendant’s witnesses Martin, Touchet, Jones and Dupree). In plaintiff’s brief, Page 3, it is admitted that these channels are crevasse channels. These channels in this area generally begin at Bayou Maringouin and run in a northeasterly and southwesterly direction. ■There are apparantly numerous old crevasse channels which cross Eldorado and Kenmore, according to plaintiff’s witness, Dr. Coleman (TR 70-71), but plaintiff in his suit asks only that seven of them be opened and restored across Kenmore (TR 195). These seven crevasse channels, as well as the apparent remnants of others, are shown on plaintiff’s exhibit designated as Nicholson “A”.
For some unexplained reason or purpose, all of these old crevasse channels or remnants of channels, except Brown’s Bayou and Dixie Bayou, designated as Sites Numbered 6 and 7 on “Nicholson A”, were diked or dammed up on the Kenmore Plantation a few feet south of the Eldorado boundary line, many years ago by parties unknown. The crevasse channel known as Little Bayou which was diked on Kenmore, also extends over and across the Belmont Plantation, located just south of Kenmore, and was also diked or dammed many years ago on Belmont a few feet south of the Kenmore boundary (TR 555). The dikes in Little Bayou (and presumably the remaining dikes) were in existence more than sixty years ago (See testimony Clarence Lewis 534 — 535, 537— 539). All of these dikes or obstructions *30 along the boundary lines were in place at the time of the earliest knowledge of the-property by Mr. James Holloway, defendant’s present manager, who has been familiar with the property for more than twenty-eight years (TR 552-555). No complaint or question was raised as to these dikes or obstructions by anyone up until the present controversy just prior to the filing of this suit (TR 557).
As we shall hereafter more particularly show, at the present time drainage is not a haphazard, hit or miss matter, dependent upon the quirks of nature, but is a highly scientific and intelligently planned and executed facet of modern agriculture and agricultural technology. Availing itself of its own resources and all of the resources available from the Parish, State and Federal Government, the defendant has developed its Kenmore Plantation into an improved and efficient farm, with good artificial drainage as recommended by expert agricultural engineers. In the course of the improvement of its lands, and at the recommendation of competent agricultural engineers in the employ of the Soil Conservation Service of the United States Department of Agriculture, numerous artificial drainage ditches and canals have been constructed on defendant’s Kenmore Plantation. In order to achieve good drainage and efficiency defendant has, on the recommendation of these agricultural engineers, completely obliterated some of the old crevasse channels crossing the Kenmore Plantation. Other property owners have followed the same procedure in improving their properties. In each case where the drainage has been improved and modernized in this general area, like on Kenmore, the water has been taken off of these properties through artificial canals running in an easterly and westerly direction, which is in accord with the dominant or primary fall of the land (See Drainage Map Pointe Coupee Parish Exhibit “Holloway 4”).
During this period of time, while the Kenmore Plantation and other places in the area were being improved and drained, the owners of the Eldorado Plantation did nothing to improve or drain that place.
The record shows that under a Parish wide drainage program of the Pointe Coupee Parish Police Jury, which we shall hereafter fully discuss, the plaintiff can obtain adequate and efficient drainage for his Eldorado Plantation, without cost to himself and without attempting to run water across the Kenmore Plantation, in the same manner as all other owners with drainage problems have obtained relief in the Parish of Pointe Coupee. This, the plaintiff declines.
In order to justify plaintiff’s contention that a servitude or servitudes of drainage exist in favor of his Eldorado Plantation and over and across defendant’s Kenmore Plantation, pursuant to Article 660 *32 of the Civil Code, the record must show that defendant’s property is “below” plaintiff’s and conversely plaintiff’s property is “above” defendant’s, and that water will naturally run or drain from one to and across the other because one is above the other. The defendant denies that this situation exists. The record is somewhat contradictory in this respect. Plaintiff relies largely on the testimony, on cross-examination, of Mr. James Holloway, Manager of the defendant corporation, who testified that in general water drained from the direction of Eldorado and on to Kenmore. However, he testified more particularly that there áre some places where water drains from Eldorado to Kenmore and other places where water drains from Kenmore to Eldorado. Topographic maps in the record and testimony of the expert witnesses show that generally and overall the properties are relatively flat, with slight undulations, and that some portions of Eldorado are higher than Kenmore and some portions of Kenmore are higher than Eldorado; These ups and downs are shown on the defendant’s ex-1 hibits identified as “Holloway 13” and “Holloway'14.”
. If. plaintiff’s porperty is over all or generally higher than defendant’s, the difference is so slight as .to be hardly discernable, and in view of the conclusions reached.by the court .based on other and more apparent criteria found in this case, any such difference in elevation, even if more pronounced, would be immaterial in arriving at a proper determination and judgment.
In asking that his plantation be recognized as entitled to a servitude of drainage across defendant’s property, plaintiff prays that the servitude or servitudes be recognized through certain channels designated as sites 1 through 7 on his exhibit “Nicholson A”, and that the servitudes be recognized “in such a way that the natural drainage of water from Eldorado to Kenmore is restored to the original natural drains from sites 1 through 7, inclusive.”
The record shows that running across Eldorado and Kenmore Plantations, as well as other properties in the area, are a number of old channels or remnants of channels. Plaintiff’s expert witnesses (Coleman and Svoboda) as well as defendant’s expert witnesses (Martin, Touchet, Jones and Dupree) each testified that these were old crevasse channels. In plaintiff’s brief it is admitted that these are crevasse channels. One of plaintiff’s witnesses testified that there were, in fact, remnants or signs of numerous other old crevasse channels crossing these properties.
The manner in which crevasse channels were formed and their natural characteristics were explained by plaintiff’s and defendant’s expert witnesses, and there *34 were no differences of any consequence in the explanation of any of these witnesses.
Many years ago Bayou Maringouin was a distributary of the Mississippi River. During high water stages the bayou would overflow its banks and the heavier particles of sand and silt would immediately settle, and this resulted in the banks of Bayou Maringouin being higher than the areas located away from the banks. From time to time a crevasse would occur in the bank of Bayou Maringouin, the flood water would scour out a channel, and the banks of this crevasse channel would immediately be built up through the same phenomena as the bank of Bayou Maringouin was built up. These crevasse channels would at some points divide into two channels, which is referred to as “bifurcate”, and these channels would later rejoin, thereby forming what is called braided channels. When this occurred there would result an area of land completely enclosed by the high banks of the crevasse channels. In this manner natural basins were formed.
Therefore, because of natural phenomena the banks of these crevasse channels, like all crevasse channels of similar origin, are higher than the areas or basins between the channels. In plaintiff’s brief it is admitted that “these particular channels are of a crevasse origin” and that “in general there is a small natural levee along the bank of each of these channels which is higher than the land farther away from the channel or bank.”
In view of these admitted facts and natural phenomena, and the additional natural phenomena that water will not drain uphill, it becomes obvious that these channels cannot be natural drains for the plaintiff’s Eldorado Plantation, or for any other property similarly situated, except possibly as to rain water that falls directly into these channels.
Plaintiff contends that although the banks of these crevasse channels are higher than the basins that lie between them, water will drain from these intervening areas and into the crevasse channels through openings that have eroded in the banks of the channels. This contention does not impress the court, and is not supported by the record. In this regard, plaintiff refers to the testimony of the civil engineer Dean and the geologist Dr. Coleman, both of whom testifed on behalf of the plaintiff.
Plaintiff’s civil engineer, Dean, in testifying with reference to a topographic map prepared by him, said that the map showed natural openings from the low basis into the crevasse channels. However, plaintiff’s geologist, Dr. Coleman, who was on plaintiff’s property during or just after a rain, testified that he observed water running through such low spots in only two places, and that he did *36 not observe and did not know whether all of the water from the particular basin was drained out through these low places. Also, this witness who was accepted as an expert in the reading of topographic maps, after examining the map prepared by the civil engineer, Mr. Dean, testified that in examining this topographic map, it would appear there were many areas on Eldorado Plantation that would hold water, or where it would stagnate.
All of defendant’s expert witnesses testified there were no natural openings in these banks and that water could drain into these crevasse channels only if artificial openings were cut through them. Mr. Sam Dupree, a reputable and responsible civil engineer, testified that the Dean map showed no such openings (TR 660-668); and, further, that in fact no such natural openings existed. Mr. Dupree did observe a number of artificial openings that had been cut in the high bank which is corroborated by the testimony of the plaintiff, himself, who testified that numerous artificial openings had been dug through the crevasse channel banks (TR 275).
In this regard, the court was particularly impressed with the testimony of Mr. Ar-ville Touchet and Mr. James Martin. Both of these witnesses testified in response to subpoenas issued by the defendant, but were not employed experts. Mr. Touchet is a soil scientist and graduate agronomist employed by the Agricultural Conservation Service of the United States Department of Agriculture. Mr. Martin is a graduate agricultural engineer, also employed by the Agricultural Conservation Service. In connection with the program of this federal agency of rendering assistance to farmers in their drainage and soil conserving needs, Mr. Touchet had made a soil classification survey and evaluation of both the Eldorado Plantation of the plaintiff and the Kenmore Plantation of the defendant. For the same reason, Mr. Martin had made a drainage survey of the plaintiff’s Eldorado Plantation and also was familiar with the topography of the defendant’s plantation.
Mr. Touchet testified that these low basins between the high banks of the crevasse channels could not naturally drain themselves (TR 449); that there was a correlation between soil classifications and elevations, and based on the soil classifications in these low basins there would not be any such natural openings (TR 446); and that he did not agree that the Dean topographic map showed any natural openings (TR 447).
Mr. Martin was positive that these low areas between the crevasse channel banks existed, not only from his engineering studies of the plaintiff’s property, but from his personal observation on the ground. He testified (TR 367):
*38 Q. “Have you seen water impounded or stagnated on the Eldorado Plantation?
A. Yes, I have.
Q. In very substantial areas?
A. Well, good sized areas, yes, sir.
Q. In various parts of the Eldorado Plantation ?
A. That’s right.
Q. Is there any way that this water could drain without the cutting of artificial ditches or channels?
A. Not the water that I observed, no; it wouldn’t drain naturally. It would drain to a point, but then it would reach a point; there would be a small lake, maybe a half a foot of water, or two or three tenths of water, or in some areas maybe up to two, two and a half feet possibly.
Q. Some of it based on your observation would be that depth?
A. That’s right.
Q. And this would be stagnated surrounded by the banks of these crevasse channels.”
A. Yes, that’s right.
Q. And you have seen these localities with your own eyes, is that right?
A. That is right.”
The court is, therefore, convinced that water cannot naturally drain from these natural basins on plaintiff’s plantation, located between the high banks of the crevasse channels; and that such drainage would be possible only through artificial openings cut through these high banks. These banks vary in height, and the record' shows that some of them are as much as three or four feet higher than the intervening basins. Therefore, the artificial openings to adequately drain these basins would necessarily be of substantial size and depth.
It is the court’s opinion that such drainage is not countenanced under Article 660' of the Civil Code as heretofore interpreted by the Louisiana Supreme Court. The Article states that the servitude is one due by the estate “situated below to receive the waters which run naturally from the estate situated above, provided the industry of man has not been used to create that servitude.” Further, although the Article says the proprietor below may not do anything “to prevent this running of the water”, it is equally important' that “the proprietor above can do nothing whereby the natural servitude due by the estate below may be rendered more burdensome.”
Most of the reported decisions relating to the servitude of drainage as provided for under Article 660 of the Civil Code are old cases. As defendant’s counsel have pointed out in brief, the reason for the lack of such cases in recent *40 years appears rather obvious. Today, with modern farming practices, little reliance is placed on natural drainage, which in most instances have proven to be completely inadequate. At this time, property owners usually take advantage of modern, efficient, artificial drainage methods and drainage programs, which in most part are designed, engineered and financed by or with the assistance of the local, state and/or federal governments.
The tremendous advances in recent years in agriculture and agricultural drainage and methods which compel the use of artificial drainage in our modern economy, would indicate the propriety of giving Article 660 of the Code a “functional” or “objective” interpretation, which under facts and circumstances shown by the record would clearly deny plaintiff the relief sought by him. However, it is not necessary, in the court’s opinion, to here delve into the intricacies of such an interpretation, because the relief prayed for cannot be granted based on the decisions of the Supreme Court rendered in former years.
The jurisprudence referred to is most clearly and fully set forth in Ludeling v. Stubbs, 34 Ann. 935, decided by the Supreme Court in 1882. The issues presented in that case were whether plaintiff’s land owed a servitude of drain to defendant’s property, and whether defendant in cutting various ditches across his plantation had done anything whereby the natural servitude which might be due had been rendered more burdensome. The standards and criteria for determining these issues and which have been repeatedly announced as proper and controlling are found in the following language of the court:
“In the case of Guesnard vs. Bird, 33 An. 796, we had occasion to make a thorough examination of the law and an exhaustive review of our jurisprudence on this question.
This review resulted in the expression of conclusions which we recently reaffirmed in the case of Kennedy vs. McCullom, 34 An. (568) not yet reported. From our jurisprudence, as thus firmly established, we understand that the issues in this case are to be tested under the following rules:
The owner of the lower lands of two adjacent estates can do no act which would impede the natural flow of waters on his lands, from those of the higher estate. The owner of the superior estate may make all drainage works which are necessary to the proper cultivation and to the agricultural development of his estate. To that end, he may cut ditches and canals by which the waters running on his estate may be concentrated, and their flow increased beyond the slow process by which they would ultimately reach the same destination.
But the owner of the superior estate cannot improve his lands to the injury of his *42 neighbor, and thus he will not be allowed to cut ditches or canals, or do other drainage works by which the waters running on his lands will be diverted from their natural flow, and concentrated so as to flow on the lower lands of the adjacent estate at a point which would not be their natural destination, thus increasing the volume of water which would by natural flow run over or reach any portion of the lower adjacent estate, or to drain over his neighbor’s lands stagnant waters from his, and to thus render the servitude due by the estate below more burdensome. C.C. Art. 660; Martin vs. Jett, 12 La. 501; Becknell vs. Wiendahl, 7 An. 291; Sowers & Jamison vs. E. Shiff et al., 15 An. 300; Barrow vs. Landry, 15 An. 681; Delahousaye vs. Judice, 13 An. 587, Guesnard vs. Bird, 33 An. 796; Kennedy vs. McCullom, 34 An.” (Emphasis ours)
“From the evidence, it appears plain to us that the only servitude due by plaintiff’s lands to defendant’s estate is to the eastern portion of the Gleason place. Hence, we conclude that by cutting the ditch running east, he has diverted waters from their natural flow, and concentrated other waters, so as to make them reach plaintiff’s lands a point which they would not have ultimately reached by slow process, as their natural destination; and that by draining by the southern bound ditch connecting with the former his Willow Pond, he has thrown in Ben-net’s Bayou, and by it on plaintiff’s lands, stagnant waters which would have naturally remained on his own lands, and that these acts fall within the prohibition contained in the Code, and that defendant has thus, by his acts, increased the burden of the servitude due by the lower estate of his neighbor.”
The Supreme Court in Petite Anse Coteau Drainage District v. Youngsville Drainage District, 146 La. 161, 83 So. 445 (1919) said that it saw no necessity of reviewing the numerous decisions involving a drainage servitude and the making of such a servitude more burdensome because “they only show the accepted and settled doctrine to be as stated in Ludeling v. Stubbs.”
In the Petite Anse Coteau case the court also with approval cited the even older case of Martin v. Jett, 12 La. 501. In that case the court stated that the Code should not be interpreted in a manner, as would in effect, condemn to sterility the superior estate. That every man has a right to clear and cultivate his land. However, the court then continued:
“But it is one thing to clear and cultivate arable lands, and another thing to reclaim lands naturally covered with stagnant waters, in such a way as to throw the mass of water, which would naturally re.main in pools or ponds, upon the lands of *44 one’s neighbor, situated below. The Roman Law, which perhaps, forms the best anticipated commentary upon this part of our code, permitted ditches to be cut by the superior owner, not for the purpose of making the 'waters flow upon the adjacent land, but for the purpose of improving, by cultivation, his land, and making it more healthy; and laid down the equitable rule, that he ought not to ameliorate his own land to the injury of his neighbors. ‘Sic debare quem meliorem agrum facere, ne vicini deteriorem faciat.’ Digest, law 1, Section 4.”
' The most recent expression of the Supreme Court is found in Broussard v. Cormier, 154 La. 877, 98 So. 403, decided in 1923. There the court cited the Petite Anse Coteau Drainage District case (Supra) and again followed the same doctrine, in almost the identical language that is found in Ludeling v. Stubbs.
Considering the standards established in Ludeling v. Stubbs, it is particularly pertinent to consider the responses given by Mr. Sam Dupree, defendant’s civil engineer, to questions involving the following hypothetical situation presented to him by defendant’s counsel (TR 674).
Q. “Let us assume, Mr. Dupree, that artificial ditches and. canals were . dug on Eldorado, and that the crevasse channels were dug out and deepened on the Eldorado and Kenmore Plantations, and that all of this was with the necessary slopes, or gradients and depths to permit, all of the surface water on the Eldorado to flow into the crevasse-channels, and thence through the crevasse channels onto the Kenmore-Plantation, would the cutting and digging of ditches and canals and. deepening of channels result in these several things that I’d like to ask-you; now, do you understand the-hypothetical question that I have-asked you ?
A. Yes, sir.”
Mr. Dupree then testified, in answer to-questions relating to the hypothetical situation, that the facts assumed in the situation would lead to the following results:
1. The diversion of water from its natural flow on Eldorado.
2. The concentration of waters so as to-flow on to Kenmore at points which would', not be their natural outlets or destinations, from Eldorado.
3. An increase in the volume of water over the volume which by natural flow would run on to Kenmore at the location, of the old crevasse channels; particularly an increase in the peak flow, which is the flow for which you have to design a drainage system.
4. Would drain off of Eldorado and' across Kenmore water that would otherwise *46 be stagnant, and which in the absence of artificial ditches and canals could not run off of Eldorado.
5. Would create a serious burden on the Kenmore Plantation.
The record contains not one word of testimony to rebut the expert views of Mr. Dupree, and in considering all of the facts presented in the record, particularly the topography of the land, the court finds that each of these conclusions is inescapably sound and correct.
Therefore, the court finds that the plaintiff’s Eldorado Plantation is not entitled to a drainage servitude across the defendant’s Kenmore Plantation through the channels •or remnants of channels which exist, or at •one time existed, on the two properties as prayed for by the plaintiff.
The court must here point out that if the facts were such as to justify the grant of a servitude to drain any part of plaintiff’s property across defendant’s property through these crevasse channels, for instance to drain the rain water that falls •directly into the crevasse channels, such would serve no useful purpose to the plaintiff. No useful purpose would be served, for at the same time the court in conformity with Article 660 and the jurisprudence, would necessarily be required to force the plaintiff to close any existing artificial openings that had been cut into the crevasse .channels and also, to enjoin the plaintiff from opening any additional artificial ditches into the crevasse channels, or performing any other work that would make the servitude more burdensome. In Walsh v. Arnous, 6 La.Ann. 97 (which case arose in Iberville Parish a part of this judicial district) there was involved a situation in which a drainage servitude was found to exist, but the plaintiff, the owner of the superior estate, had artificially opened drains on his estate which made the servitude more burdensome. The Supreme Court, in denying relief to the plaintiff, said:
“As the case is before us, we could not, under the law, render a judgment in favor of the plaintiff without compelling him at the same time to close all his artificial drains. He would gain nothing by such a decree.”
Although the conclusions here reached are based on the language of Article 660 of the Code as interpreted by our Supreme Court in numerous cases, since injunction is an equitable remedy it is at least pertinent and germane, finally, to comment briefly on the equities involved in this case.
The property of the defendant, Holloway Planting Company, is a well developed, improved and fertile sugar cane plantation. This plantation, as well as all of the property in the- area, is substantially level and not adequately and properly drained by nature. In recent years the defendant company, with the assistance and collaboration *48 of governmental agencies, under public programs provided for that purpose and at considerable expense to all involved, has provided and effectuated a plan and program of drainage for this property. Under this program, canals were dug running in an easterly and westerly direction between Bayou Maringouin and the Atchafalaya Spillway Canal, which are the two drainage outlets for all of the property in this area. Numerous cross ditches have been dug and the land has been graded and leveled. In this program the defendant, as well as other property owners in the area, on the recommendation of competent agricultural engineers of the Soil Conservation Service of the USDA, has obliterated most of the old crevasse channels which, in the opinion of these disinterested expert advisers, was and is essential to obtain proper land grading and drainage. This work was commenced on defendant’s property more than twenty years ago.
Also, beginning more than twenty years ago, the Parish of Pointe Coupee through its police jury commenced and since has carried out an extensive and comprehensive parish-wide land drainage program. This program which was started with the assistance and collaboration of the Department of Public Works of the State of Louisiana has been continued without interruption. The program is financed by tax money derived from the tax payers of Pointe Coupee Parish, supplemented by state funds, and also with the assistance of the Federal Government particularly through engineering advice, assistance and supervision furnished by the Soil Conservation Service of. the USDA. Much of the land in Pointe Coupee Parish has been drained through this program.
Under this parish-wide program wherever property owners have shown a need for drainage, such drainage has been forthcoming. In this particular area of the parish, artificial canals have been dug running in an easterly and westerly direction draining toward the front into Bayou Maringouin and toward the rear into the Atchafalaya Basin Spillway Canal.
The court is convinced from all of the facts in the record, including particularly the drainage systems of other plantations in the subject area and the testimony of the expert witnesses, including Mr. Martin, the agricultural engineer of the Soil Conservation Service, Mr. W. D. Jones, who preceded Mr. Martin in that capacity, Mr. Sam Dupree, the civil engineer, and Mr. C. O. Watts a practical farmer who has had much experience in agricultural drainage, that the proper and most effective drainage for plaintiff’s Eldorado Plantation is from east to west through artificial canals, similar to what has been done on other properties in the area.
The President of the Pointe Coupee Parish Police Jury testified that he had *50 informed the plaintiff, Mr. Nicholson, that if the plaintiff requested, the police jury, -without cost to the plaintiff and as a part ■of the parish-wide drainage program, would dig a drainage canal running in an easterly and westerly direction from a point of beginning near the eastern side of plaintiff’s plantation to the Atchafalaya Spillway ■Canal on the West, in conformity with the drainage pattern in the area. The plaintiff was further informed that the canal would be adequate in size to drain the area for which the plaintiff seeks drainage in this lawsuit. Mr. Nicholson, the plaintiff, declined to accept this offer of assistance.
The record is equally clear that to require the opening of these old crevasse channels on defendant’s property and to direct the drainage water from plaintiff’s plantation through these old channels, would cause severe and irreparable damage to defendant and its plantation. Defendant’s witnesses so testified, without contradiction by plaintiff’s witnesses'. I must agree with defendant’s brief, in describing the effect such action would have on defendant’s plantation, where it is stated:
“Its symmetric fields would be mutilated by the meanders of the old crevasse channels which it would be required to open and dig out. Its land forming and grading would be completely disrupted. Its drainage would be converted from a modern artificial system to an inconceivable and impossible state of confusion. In addition to its artificial ditches and canals, the affected portion of the Kenmore Plantation would be crossed by these crevasse channels running in a meaningless manner in varying directions, all subject to the control of the owner of the neighboring plantation.”
The solution to plaintiff’s drainage requirements lies in the drainage program offered by the police jury of Pointe Coupee Parish. Under R.S. 33 :1236(13) the police juries of the state have been vested full power and authority to satisfy the drainage needs of their respective parishes. Specifically, the statute says:
“The police juries shall have the following powers:
(13) To construct and maintain drainage, drainage ditches, and drainage canals; to open any and all drains which they may deem necessary and to do and perform all work in connection therewith; to cut and open new drains, ditches and canals, to acquire lands for all necessary public purposes, including rights of way, canals and ditches by expropriation, purchase, prescription or by donation; to enter into contracts for the construction of such drainage works and to purchase machinery and have the work performed under their own supervision; to allocate, use and expend the general alimony of the parish for any of the above purposes; to incur debt and issue bonds for drain *52 age and drainage canals in the manner provided for by Subtitle II of Title 39; and use such other funds as may be legally expended for such purposes; to levy taxes for the maintenance óf said drainage works in the manner provided for and under the' authority of Article X, Section -10 of. the Constitution of the State of Louisiana, as amended, and to construct any works and do any and all things necessary to effect proper drainage and carry this’ Paragraph into effect; to enter into contracts or agreements; under such terms and conditions as may be mutually agreeable with the State of Louisiana, through the Department of Public Works for the securing of State aid for the purposes herein authorized; to cooperate and participate in any State or Federal aid program which may now exist or which may hereafter come into effect under any State or Federal Law. Police juries shall open all natural drains which they may deem necessary in their respective parishes and shall perform all work connected therewith, which they may deem necessary to make the opening of natural drains effective. They may perform all other acts necessary to fully drain all the land in their respective parishes and maintain such drainage when established. This Paragraph is intended to furnish additional means whereby parishes in the State of Louisiana may accomplish the objects and purposes herein referred to, arid shall be liberally interpreted.”
The property owners of Pointe Coupee Parish are fortunate that their police jury is carrying out the objects and purposes-of this statute. The court can only suggest, but does suggest that the plaintiff take advantage of this oppprtunity that is his.
It is therefore the opinion of the court, that judgment should be rendered in favor of Holloway Planting Company, Incorporated, defendant, and against Jerry K.. Nicholson, plaintiff, dismissing plaintiff’s-suit against defendant.